UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JACQUELINE NIXON, QIANA NIXON,
JASMINE VARGAS, QUARECE NURSE,
DEJA BLUNT, JAMOL DONEGAN,
LEVAL JEMMOTT, FRANKLIN MOULTRIE,

                              Plaintiffs,          **FIRST AMENDED COMPLAINT**

           -against-                                  Jury Trial Request

                                                                          19 CV 7215 (PKC) (LB)

THE CITY OF NEW YORK,
POLICE COMMISSIONER JAMES O'NEILL,
LT. OMAR BIRCHWOOD,
LT. MICHAEL RAIMO,
D.I. JESSE LANCE,
P.O. MICHAEL FONTANA,
P.O. RYAN JAFFE,
P.O. JONATHAN FRITH,
P.O. JASON GAMMELLO,
P.O. MATTHEW BYRNES,
P.O. ANTHONY PRISINZANO,
P.O. XAVIER GALLOZA,
SGT. THOMAS TURNER,
P.O. RONI JENKINS,
P.O. JONATHAN SUERO,
P.O. JONATTHAN EPPS,

                              Defendants.
-------------------------------------------------------------X

       Plaintiffs by and through their attorney, Vik Pawar, Esq. respectfully alleges as follows:

## **PRELIMINARY STATEMENT**

       1.     Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983, and 1988 for violations of his civil rights, as secured by statutes and the Constitution of the United States.

## JURISDICTION

2. The action is brought pursuant to 42 U.S.C. §§ 1983, and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution.

3. Jurisdiction is found upon 28 U.S.C. §§1331 and 1343.

## VENUE

4. Venue is properly laid in the Eastern District of New York under 28 U.S.C. § 1391(b), in that it is the District in which the claim arose.

## JURY DEMAND

5. Plaintiffs respectfully demand a trial by jury of all issues in the matter pursuant to Fed. R. Civ. P. 38 (b).

## PARTIES

6. Plaintiffs are citizens of the United States, and at all relevant times was a resident of the County of Kings, City and State of New York.

7. Defendant City of New York is a municipal corporation duly established under the laws and constitution of the State of New York. Defendant O'Neill is the Police Commissioner of the NYPD, Defendants Birchwood, Raino, Lance and are/were officers from the 73rd precinct and employed by the NYPD. They are all sued in their individual, official and supervisory capacities. Defendants P.O. MICHAEL FONTANA, P.O. RYAN JAFFE, P.O. JONATHAN FRITH, P.O. JASON GAMMELLO, P.O. MATTHEW BYRNES, P.O. ANTHONY PRISINZANO, P.O. XAVIER GALLOZA,

SGT. THOMAS TURNER, P.O. RONI JENKINS, P.O. JONATHAN SUERO, P.O. JONATTHAN EPPS are or were members of the PSA 2 and PSA 4 of the NYPD. To the extent applicable they are either sued in their individual capacities or their role in supervisory capacities. All individual defendants are designated as "NYPD defendants"

## FACTS

8. On December 31, 2016, plaintiffs got together for an annual event to celebrate the life of their family member who was shot to death by NYPD on January 1, 2003.

9. Similar to past years, the event was being held at plaintiff Jacqueline Nixon's ("Nixon") home at 365 Sackman Street, Apt, 1H, Brooklyn, New York ("subject premises").

10. All plaintiffs arrived at the subject premises before midnight on December 31, 2016. All plaintiffs either resided at the subject premises or were otherwise guests at the subject premises who enjoyed the rights and protections under the Constitution.

11. On January 1, around 12:15 a.m., defendants Birchwood, Raino and Lance ("NYPD defendants") knocked on the door at the subject premises under the guise that they "heard shots" and that they witnessed the alleged shooter run into the building which contained the subject premises.

12. Plaintiffs having been through the lies and disinformation by the NYPD regarding shootings informed the NYPD defendants that they were mistaken and that the plaintiffs were involved in a private celebration and none of the occupants of the subject premises were involved whatsoever in any "shooting".

13. NYPD Defendants requested permission to enter the subject premises and

plaintiff Nixon clearly and unequivocally stated "No."

14. When defendants continued to insist, plaintiffs demanded a warrant before they allowed entry to the defendants.

15. This encounter lasted more than an hour and NYPD defendants refused to allow the plaintiffs to close their front door by wedging their body and feet against the door.

16. Eventually, some of the plaintiffs simply decided to leave the subject Premises rather than deal with the unlawful and harassing tactics employed by the individual defendants.

17. Even though he was peacefully exiting, Plaintiff Levar was dragged outside of the subject premises pushed against the side of the building, had his phone snatched from his hand when he attempted to record the assault and stopped, frisked, searched and was fondled by the defendants Raino, Birchwood, Lance and John and Jane Doe defendants acting under the direction of the higher ranking defendants all the while they kept using the "N" word. Levar was not permitted to leave.

18. As he exited, Plaintiff Blunt was stopped, searched and frisked outside the subject premises in the hallway and not permitted to leave by the defendants Raino, Birchwood, Lance and John and Jane Doe defendants acting under the direction of the higher-ranking defendants all the while they kept using the "N" word. Blunt was not permitted to leave.

19. Inside the subject premises, NYPD defendants forcibly entered and directed everyone to sit down and threatened plaintiffs that they were in trouble because they were giving defendants a "hard time."

21. NYPD defendants then repeatedly asked plaintiffs whether they had a "law degree" and under what circumstances were they not allowing them inside the subject premises and search the location.

22. When plaintiffs refused to acquiesce to defendants' unlawful conduct, NYPD defendants threatened that they would call ACS on some of the plaintiffs inside the subject premises because there were minor children present.

23. These threats came after plaintiffs demanded that they leave their home and the subject premises and that the NYPD defendants and John and Jane Does 1-5 acting under their supervision did not have a legal right to be inside there and threatening the plaintiffs.

24. Defendants seized the plaintiffs inside their home, frisked, stopped, searched them individually, searched the subject premises to justify their illegal entry and continued to violate their rights against unreasonable search and seizure, engaged in retaliation by "writing up" plaintiffs to ACS.

**AS AND FOR THE FIRST CAUSE OF ACTION**
(Unlawful Seizure, Unreasonable Search, Illegal Entry, Excessive Force under the 4th Amendment, Due Process Clause of the 14th Amendment)

25. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

26. Plaintiffs were stopped, frisked, seized and falsely arrested without probable cause by the defendants.

27. Plaintiffs were privately in their home not engaging in any unlawful conduct and enjoyed privacy and Constitutional protections against unreasonable search and seizure and against warrantless entry into the subject premises.

28. Despite these constitutional protections, NYPD defendants and John and Joe defendants 1-5 acting with and under the direction of the NYPD defendants stopped, searched, seized, frisked and abused the plaintiffs inside the subject premises.

**AS AND FOR A SECOND CAUSE OF ACTION**
(*Monell* claim – Failure to Train)

29. Plaintiffs repeat, reiterate, and reallege each and every allegation in the foregoing paragraphs with the same force and effect as if fully set forth herein.

30. The City through the NYPD has been deliberately indifferent to the rights of its citizens and although they could have, they fail to address the problem as outlined below which in turn leads to the violations of individuals like plaintiffs' constitutional rights.

31. In addition, it is not uncommon that NYPD officers to submit falsely sworn statements to hide their unconstitutional conduct. *See Colon v. City of N.Y.*, No. 09 Civ. 8, 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009) ("Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration ... there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.").

32. The City through the NYPD is aware that an officer would encounter a situation where he/she has to apply the law as stated in the Constitution particularly the 4th amendment rights to be free from unreasonable search and seizure. The Officer then faces

a difficult choice on best to apply the constitutional rights against private citizens like the plaintiff. The officer faces a difficult choice to further engage in unconstitutional conduct or simply walk away from the situation. Either of these difficult choices lead to the violation of constitutional rights and thus causing injuries to individuals like plaintiff.

33. Despite being aware of the difficult choices faced by the NYPD officers, the NYPD has failed to enact policies or implement safeguards for these officers who may very well may have made the initial stop or seizure under a good-faith basis, but such good-faith rationale no longer exists. However, despite being aware of the dilemma faced by the officer, the NYPD has failed to properly train their officers in the area of enforcing police rights versus the rights afforded to plaintiffs under the constitution. These deliberate indifference acts by the City through the NYPD and the existence of policy and custom and practice that leads to violation of constitutional rights of plaintiffs and is the proximate cause of injuries suffered by plaintiff as outlined throughout this complaint.

33. Defendant O'Neill is the Police Commissioner of the NYPD and defendant City and who is in charge of training and supervising his subordinates. They are both referenced interchangeably as "O'Neill" or "City" in the following paragraphs.

34. O'Neill is in charge of training police officers on the legal basis to enter, search, stop and frisk a private citizen and train them under the laws of the Fourth Amendment. The NYPD should be aware of these instances because they faced lawsuits on this very issue and which lawsuits resulted in an adverse finding by the Court against the NYPD stops and frisks of minorities like the plaintiffs in this action. In fact, Judge Scheindlin in *Floyd v. City of New York,* 813 F.Supp.2d 417, 422, (S.D.N.Y. 2011), noted that "it is clear that the policing policies that the City has implemented over the past decade

and a half have led to a dramatic increase in the number of pedestrian stops, to the point of now reaching 'almost 600,000 a year.' There is 'a disturbingly large racial disparity in who is victimized by these practices,' although the precise extent of the disparity and its causes are matters of dispute. This is not the first time the City of New York has been accused of racial profiling. In particular, a previous lawsuit before this Court, *Daniels v. City of New York,* was resolved through a settlement agreement requiring the City to adopt several remedial measures intended to reduce racial disparities in stops and frisks." See also *See Davis v. City of N.Y.*, 959 F. Supp. 2d 324, 355 (S.D.N.Y. 2013) ("In sum, based on plaintiffs' documentary and testimonial evidence, as well as [an expert's] opinions, a reasonable juror could conclude that the City has engaged in a practice of making unconstitutional stops and arrests in and around NYCHA buildings as part of its trespass enforcement practices, and that this practice is sufficiently persistent and widespread to serve as a basis for *Monell* liability."). Both the *Floyd* and *Davis* decisions are incorporated into this complaint.

35. The NYPD's Patrol Guide, which spans thousands of pages detailing hundreds of police procedures, -including- search warrants execution- yet does not contain a statement or guideline that the Fourth Amendment prohibits warrantless arrests or seizures without a probable cause of innocent individuals.

36. These problems, while obvious to O'Neill and the City, were made clear in *McClary v. City of New York et al.*, No. 12-cv-1 18 (E.D.N.Y.). In that case, then-Chief Judge Carol Bagley Amon permitted the plaintiff to add a *Monell* claim based on the City's failure to train its officers in the constitutional limit.

37. The evidence adduced in the *McClary* case, which was presented to Judge

Amon in support of the plaintiff's motion for leave to amend, included:

  a. Sgt. Sonia Christian's testimony that she had received no training during or after the Police Academy on how to conduct a search of a house, but had been instructed that officers are allowed to search anywhere an object of the search may physically be located.

  b. Officer Matthew Vorraro's testimony that he did not remember receiving any training at the Police Academy on how to search a house or any training at anytime on minimizing or how to minimize damage while executing a search warrant.

  c. Officer Mark Kipybida's testimony that he did not receive any training at the Police Academy on how to execute a search warrant; nor did he receive any training about minimizing damage during the execution of a search warrant.

  d. Lt. Andrew Hepworth's testimony that in his twenty-four years as an NYPD officer, the only training he could recall receiving on executing a search warrant was after he was promoted to sergeant, and that the training was only given to "certain supervisors." He did not testify that the training covered the issue of limiting damage during the execution of the search.

  e. Officer Gregory Michels's testimony that he did not receive any training at the Police Academy in how to execute a search warrant, did not receive any training at the Police Academy on minimizing damage during the execution of a search warrant, and did not receive any training after graduating from the Academy on how to execute a search warrant.

f. Captain Craig Adelman's testimony that he was not aware of any guidelines, instructions, or training that explained that property damage should be minimized during the execution of search warrants.

g. Officer Ronald Schmidt's testimony that he did not receive any training on how to execute a search warrant.

h. O'Neill is aware of these instances of lack of training but has not done anything to implement a training program based on stop, frisk, search and seizure of innocent individuals like the plaintiffs and their home.

38. Additional evidence adduced in the *McClary* case demonstrated that NYPD officers are not properly trained, supervised, or disciplined regarding the limitation placed upon them for entering homes without a search warrant or lack of exigent circumstances or any training whatsoever that citizens have a right to film misconduct by the NYPD without any reprisals. O'Neill is aware of this and yet has failed to implement adequate training measure.

39. On September 24, 2013, NYPD Chief John Essig testified in a deposition on behalf of the City of New York pursuant to Fed. R. Civ. P. 30(b)(6) regarding the NYPD's policies on how officers are instructed to execute search warrants.

40. Chief Essig testified to the following facts:

a. he knew of no Patrol Guide provision or training materials that explained the constitutional standard that only reasonable damage was permitted during search warrant execution;

b. he did not believe there is a limitation on damage that is permissible in the execution of a search;

c. the only training materials addressing the execution of search warrants that are provided to police officers describe what officers can look for and where they can look, but do not provide an explanation on how the search should be carried out;

d. in the training materials he had reviewed to prepare for his deposition, he found no discussion about the limitation on damage that is acceptable during the execution of a search warrant;

e. there are no materials given to new recruits at the Police Academy and no classroom instruction provided to new recruits that explain there are limitations on damage;

f. there is no training provided at the Academy for new recruits on the manner of executing search warrants;

g. there is no classroom training for new supervisors about the manner in which search warrants should be executed;

h. he had seen no lesson plans for instruction, either for recruits or supervisors, about the manner in which search warrants should be executed;

i. officers are trained that they can look anywhere they thought a piece of evidence could be, which included looking inside a couch; and

j. he was not aware of any officer who had been disciplined for problems during the execution of a search warrant.

41. Upon information and belief, following the *McClary* case, and before the execution of the search warrant at the subject premises, O'Neill through the NYPD did not amend the Patrol Guide to include a statement or guideline about the constitutional limitation on forcible entry into a home without a warrant.

42. Upon information and belief, following the *McClary* case, and before the incident at issue here, neither the City nor O'Neill implemented policies to ensure that NYPD officers are adequately trained or supervised so that innocent individuals such as the plaintiffs are not otherwise subject to unconstitutional conduct.

43. Despite the obvious need to do so, the City has failed to train its police officers that the Constitution prohibits unreasonable search and seizure or warrantless entry into a home or the first amendment which protects citizens like plaintiffs to record NYPD misconduct without being subject to retaliation.

44. O'Neill and the City have known that NYPD officers routinely cause excessive or unnecessary constitutional injuries to innocent individuals similar to the plaintiffs.

45. O'Neill and the City have known that NYPD officers do not understand the constitutional limitations on arrests, seizures or warrantless entry into a person's home.

46. In the face of this continuing problem, O'Neill and the City have remained indifferent and failed to adequately train NYPD officers to ensure that they do not cause constitutional injuries like the ones described in this complaint.

47. The damage to the Plaintiff's constitutional rights is of the kind seen in the *McClary* case and other cases where NYPD officers have caused unnecessary constitutional damage.

48. The City's deliberate indifference was the moving force of the unconstitutional damage complained of herein.

## AS AND FOR A THIRD CAUSE OF ACTION
(Failure to Intervene)

49. Plaintiff repeats, reiterates and realleges each and every allegation

contained in the foregoing paragraphs as if fully set forth herein.

50. Defendants, who are law enforcement officers, observed the unconstitutional acts of their fellow NYPD defendants officers. These defendants had an affirmative duty to intervene to protect violation of constitutional rights and injuries to plaintiff's body as detailed in the foregoing paragraphs of the complaint by other NYPD defendants (law enforcement officers) in their presence.

51. Defendants knew or observed that unlawful stop, search, frisks and seizure of the plaintiffs was taking place in their presence by one of their fellow NYPD officers and had an opportunity to intervene on behalf of the plaintiffs and failure to intervene to prevent further harm to the plaintiffs. As a result, plaintiff suffered constitutional injuries as described in the foregoing paragraphs on the complaint.

### AS AND FOR A FOURTH CAUSE OF ACTION
(Supervisory Liability)

52. Plaintiffs repeat, reiterate and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53. Defendants Raino, Lance and Birchwood were either lieutenants or deputy inspector at the time of the incident outlined in this complaint.

54. These NYPD defendants enjoyed a supervisory role on the date of the incident.

55. These NYPD defendants had a duty and an obligation to supervise them subordinates and to police their conduct to ensure compatibility with the Constitution.

56. Yet, these NYPD defendants not only failed to supervise or act in their supervisory roles, they participated in violating the constitutional rights of the plaintiffs in

tandem with their subordinate officers. The supervisory defendants observed their subordinate officers enter the subject premises without a warrant, threaten the plaintiffs with retaliation and refused to enjoin their subordinates.

57. As a result of the foregoing, defendants are liable under the theory of supervisory liability because their actions or lack thereof caused and continue to cause plaintiff constitutional injuries.

## AS AND FOR A FIFTH CAUSE OF ACTION
(First Amendment Violation- Retaliation and Interference)

58. Plaintiffs repeat, reiterate and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59. Plaintiffs engaged in conduct that was protected under the Constitution.

60. Plaintiffs were filming NYPD defendants while they forcefully attempted to enter the premises.

61. NYPD defendants, instead, flashed blinding flashlights at plaintiffs so that their identity will be obscured.

62. Plaintiffs engaged in protected conduct under the First Amendment.

63. Defendants retaliated against plaintiffs by entering their home without a warrant and stopping, searching, frisking and seizing the plaintiffs.

64. Defendants further retaliated against plaintiffs by threatening to and or actually reporting plaintiffs to the ACS because plaintiffs refused to allow them to enter their premises without a warrant.

65. As a result, plaintiffs' rights under the Constitution were violated and they suffered injuries.

**WHEREFORE**, Plaintiffs demand judgment and prays for the following relief, jointly and severally, against the defendants:

(A) full and fair compensatory damages as determined by a jury:

(B) punitive damages in an amount to be determined by a jury;

(C) reasonable attorney's fees and the costs, expenses and disbursements of this action;

(D) direct the NYPD to implement guidelines to prevent further violations of innocent individuals constitutional rights; and

(D) such other and further relief as appears just and proper.

Dated: New York, New York
March 18, 2020

PAWAR LAW GROUP, P.C.
20 Vesey Street, Suite 1210
New York, New York 10007
(212) 571-0805

By:/s
   Vik Pawar (VP9101)
   *Attorney for Plaintiff*