UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
JACQUELINE NIXON, QIANA NIXON,
JASMINE VARGAS, QUARECE NURSE,
DEJA BLUNT, JAMOL DONEGAN, LEVAL
JEMMOTT, and FRANKLIN MOULTRIE,

                Plaintiffs,

      - against -

THE CITY OF NEW YORK, POLICE
COMMISSIONER JAMES O'NEILL, OMAR
BIRCHWOOD, MICHAEL RAIMO, JESSE
LANCE, MICHAEL FONTANA, RYAN
JAFFE, JONATHAN FRITH, JASON
GAMMELLO, MATTHEW BYRNES,
ANTHONY PRISINZANO, XAVIER
GALLOZA, THOMAS TURNER, RONI
JENKINS, JONATHAN SUERO, and
JONATHAN EPPS,

                Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-7215 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

      In this action under 42 U.S.C. § 1983, Plaintiffs Jacqueline Nixon, Qiana Nixon, Jasmine Vargas, Quarece Nurse, Deja Blunt, Jamol Donegan, Leval Jemmott, and Franklin Moultrie allege that their constitutional rights were violated during an incident involving members of the New York City Police Department ("NYPD") just after midnight on January 1, 2017. Plaintiffs originally identified as defendants the City of New York ("the City"), then-Police Commissioner James O'Neill, Lieutenants Omar Birchwood and Michael Raimo[1], Deputy Inspector Jesse Lance, and unnamed John and Jane Does. Plaintiffs subsequently filed a First Amended Complaint

---

[1] Although Plaintiffs at times refer to Defendant Raimo as "Raino" (*see, e.g.*, Complaint ("Compl."), Dkt. 1, ¶¶ 8, 12, 18), it appears that the correct spelling is "Raimo" (*see* Letter dated March 31, 2020, Dkt. 19).

1

("FAC") naming 11 NYPD officers (the "FAC Defendants") in place of the Doe defendants. Defendants now move to dismiss the claims against the FAC Defendants, as well as the claims against O'Neill and the City. In response, Plaintiffs move to amend their complaint a second time. As explained below, Defendants' motion to dismiss is granted in its entirety, and Plaintiffs' motion to amend is granted in part and denied in part.

## BACKGROUND

### I. Factual Background

The FAC alleges the following facts, which, at this stage of the proceedings, the Court accepts as true and construes in the light most favorable to Plaintiffs. *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012).

On the evening of December 31, 2016, Plaintiffs were gathered at the apartment of Plaintiff Jacqueline Nixon, in Brooklyn, for an annual event celebrating the life of a family member who had been shot and killed by NYPD officers on New Year's Day 2003. (FAC, Dkt. 12, ¶¶ 8–9.) At around 12:15 a.m., Defendants Birchwood, Raimo, and Lance ("NYPD Defendants") knocked on the door of the apartment and requested permission to enter, saying that they had "heard shots" and witnessed the purported shooter run into the building. (*See id.* ¶¶ 11, 13.) Plaintiffs informed the NYPD Defendants that they "were mistaken," the people in the apartment were privately celebrating, and no one had been involved in any shooting. (*Id.* ¶ 12.) Plaintiffs accordingly refused to let the NYPD Defendants enter the apartment without a warrant. (*Id.* ¶¶ 13–14.) This encounter lasted for over an hour, during which time the NYPD Defendants kept the door open with their feet and bodies. (*Id.* ¶ 15.)

Eventually, some of the plaintiffs decided to leave the apartment. (*Id.* ¶ 16.) When Plaintiff Jemmott[2] peacefully attempted to leave, the NYPD Defendants, along with the FAC Defendants, dragged Jemmott outside, pushed him against the side of the building, took his cellphone when he attempted to record the events, frisked and searched him, and ultimately did not permit him to leave—all while repeatedly "using the 'N' word." (*Id.* ¶ 17.) Similarly, when Plaintiff Blunt attempted to leave, the NYPD Defendants and FAC Defendants frisked and searched Blunt and did not allow Blunt to leave—all the while using the "N" word. (*Id.* ¶ 18.)

The NYPD Defendants and FAC Defendants then forcibly entered the apartment. (*Id.* ¶ 19.) Although Plaintiffs demanded that the officers leave the apartment, the NYPD Defendants and FAC Defendants told Plaintiffs that they were "in trouble" and threatened to report some of the plaintiffs to the Administration of Children's Services ("ACS") because there were minor children present. (*See id.* ¶¶ 19–23.) The NYPD and FAC Defendants frisked and searched Plaintiffs individually, searched the apartment, and "'[wrote] up' [P]laintiffs to ACS." (*Id.* ¶ 24.)

## II. Procedural History

On December 24, 2019, nearly three years after the incident in question, Plaintiffs commenced this action by filing a complaint against the City, Commissioner O'Neill, the NYPD Defendants, and unnamed John and Jane Does. (*See generally* Compl., Dkt. 1.) By letter dated January 14, 2020, the City requested an additional 60 days to answer the Complaint. (Dkt. 10, at 1.) Plaintiffs consented to an 81-day extension so long as the City produced "all non-privileged documents and names of John and Jane Does within those 81 days." (*See id.*) The Court granted the extension and ordered the City—as well as O'Neill and the NYPD Defendants—to respond to

---

[2] Although the FAC refers to "Plaintiff Levar," the Court presumes that the FAC means to refer to Plaintiff Leval Jemmott, as there is no plaintiff with the last name Levar. (*See* FAC, Dkt. 12, ¶ 17.)

3

the Complaint by March 17, 2020. (1/15/2020 Order.) The Court also directed the parties to exchange their initial disclosures under Federal Rule of Civil Procedure ("Rule") 26(a)(1) by the same date. (*Id.*)

On March 17, 2020, the City, O'Neill, and the NYPD Defendants filed an Answer and served a disclosure identifying the 11 FAC Defendants. (*See* Answer, Dkt. 11; *see also* Defendants' Memorandum of Law in Support of the Motion to Dismiss ("Defs.' Mot."), Dkt. 34, at 2.) The next day, Plaintiffs filed the FAC, substituting the previously unnamed defendants with the FAC Defendants. (*See* FAC, Dkt. 12.)

On June 2, 2020, Defendants requested a pre-motion conference in anticipation of filing a Rule 12(b)(6) motion to dismiss the claims against the FAC Defendants as barred by the three-year statute of limitations.[3] (Dkt. 21, at 1–2.) Defendants also indicated that they planned to seek dismissal of the claims against the City and Defendant O'Neill. (*Id.* at 2–3.) Plaintiffs filed a response. (Dkt. 22.) The Court granted the request for a pre-motion conference on June 10, 2020, and held a pre-motion conference on July 2, 2020. (*See* 6/10/2020 Order; 7/2/2020 Minute Entry.) At the pre-motion conference, the Court allowed Plaintiffs until September 3, 2020 to secure information from the Civilian Complaint Review Board ("CCRB") regarding their due diligence in attempting to identify the FAC Defendants before the expiration of the statute of limitations. (*See* 7/2/2020 Minute Entry.) The Court also set a briefing schedule for Defendants' anticipated motion to dismiss. (*Id.*)

---

[3] Section 1983 itself "does not provide a specific statute of limitations," so "courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citations omitted). "The three-year statute of limitations of New York CPLR 214(5), which governs general personal injury actions, is applicable to Section 1983 cases filed in New York." *Phillips v. City of New York*, 304 F. Supp. 3d 305, 311 (E.D.N.Y. 2018) (citing *Owens v. Okure*, 488 U.S. 235, 251 (1989)); *accord Hogan*, 738 F.3d at 517.

On September 15, 2020, after the September 3 deadline had passed, Plaintiffs moved to compel Defendants to produce "the IAB file for the underlying incident," representing that they were still awaiting a response from the CCRB. (Dkt. 26.) On October 5, 2020, Defendants served their Rule 12(b)(6) motion, in accordance with the briefing schedule established at the pre-motion conference. (Dkt. 29.) On the following day, October 6, 2020, Plaintiffs filed a letter requesting permission to file a Second Amended Complaint ("SAC"). (Dkt. 30.) In that letter, Plaintiffs stated that they had received a response from the CCRB. (*Id.* at 1.) In light of Plaintiffs' receipt of a response from the CCRB, the Court denied Plaintiffs' motion to compel on October 15, 2020. (10/15/2020 Order.) The Court also ordered Plaintiffs to serve a formal motion to amend that included the proposed amended complaint, directing that such motion be served at the same time as Plaintiff's opposition to the motion to dismiss. (10/15/2020 Scheduling Order.)

On November 19, 2020, following a request for an extension of time that the Court granted (*see* Dkt. 32; 10/29/2020 Order), Plaintiffs served their motion to amend (*see* Dkt. 33). This also functioned as a response to Defendants' Rule 12(b)(6) motion to dismiss. (*See* Dkts. 35, 36; *see also* 12/11/2020 Order.)[4] Plaintiffs' proposed SAC omits reference to the FAC Defendants, and thus, it identifies the same named defendants as the original Complaint, except for substituting Defendant Raimo with the administrator of his estate.[5] (*See* SAC, Dkt. 36-2; *see also* Plaintiffs'

---

[4] In accordance with the Court's order dated 12/11/2020, the Court construes Plaintiffs' filing at Dkt. 35 as their opposition to Defendants' motion to dismiss. That document is substantively the same as Plaintiff's motion to amend at Dkt. 36—the only difference is that Dkt. 36 includes a "Notice of Motion" not included in the filing at Dkt. 35. (*Compare* Dkt. 35, *with* Dkt. 36.) The Court herein cites primarily to Dkt. 36.

[5] On March 31, 2020, defense counsel filed a letter advising that Defendant Raimo had passed away and that Defendants were "attempting to ascertain whether a representative ha[d] been appointed to his estate, and if so, how service should be made on the representative." (Dkt. 19, at 1.)

5

Memorandum in Support of Motion to File a Second Amended Complaint ("Pls.' Mot."), Dkt. 36-1, at 4.) The SAC also adds to the claim brought against the City under *Monell v. Department of Social Services*, 436 U.S. 658, 690–94 (1978), in an effort to withstand Defendants' motion to dismiss. (*See* Pls.' Mot., Dkt. 36-1, at 4 ("The allegations in the SAC are the same but the allegations have been factually beefed up to withstand any motion to dismiss."). *Compare* SAC, Dkt. 36-2, ¶¶ 29–53, *with* FAC, Dkt. 12, ¶¶ 29–48.)

Defendants do not object to the withdrawal of all claims against the FAC Defendants, nor do they object to the substitution of Defendant Raimo with the administrator of his estate. (*See* Defendants' Reply in Further Support of Defendants' Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend ("Defs.' Reply"), Dkt. 34-6, at 1.) Defendants, however, maintain that amendment is futile with respect to the *Monell* claim against the City and the claims against Defendant O'Neill, who was not personally involved in the alleged incident on January 1, 2017. (*See id.*)

## DISCUSSION

### I.   Legal Standards

#### A.   Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Making this determination is "a context-specific task" that requires the Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Although the Court accepts as true all factual allegations contained

in a plaintiff's complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *accord Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

### B. Rule 15(a) Motion to Amend

As discussed, rather than directly opposing Defendants' Rule 12(b)(6) motion to dismiss, Plaintiffs move for leave to file the SAC, which they may do "only with the opposing party's written consent or the court's leave." *See* Fed. R. Civ. P. 15(a)(2). Rule 15(a) expressly provides that a court should "freely give leave" to amend "when justice so requires." *Id.* Nevertheless, "it is within the sound discretion of the district court to grant or deny leave to amend." *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy*, 482 F.3d at 200 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Proposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Thea v. Kleinhandler*, 807 F.3d 492, 496–97 (2d Cir. 2015) (internal quotation marks omitted) (quoting *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015)).

## II. Substitution of Defendant Raimo

Because Defendant Raimo is deceased, the SAC proposes substituting Raimo with "Administrator of the Estate of Lt. Michael Raimo," *i.e.*, the person who "is in charge of the estate of the late defendant Michael Raimo." (*See* SAC, Dkt. 36-2, Caption, ¶ 7.) Defendants do not object in principle to this substitution but note that simply replacing Raimo's name with the words "Administrator of the Estate of Lt. Michael Raimo" is "not a proper substitution, as the representative of [Raimo]'s estate, if there is one, has not been identified or named." (Defs.' Reply,

7

Dkt. 34-6, at 1 & n.1.)  Under Federal Rule of Civil Procedure 25, which governs the substitution of parties, a proper party for substitution is

> either (1) a successor of the deceased party—a distributee of an estate if the estate of the deceased has been distributed at the time the motion for substitution has been made, or (2) a representative of the deceased party—a person lawfully designated by state authority to represent the deceased's estate.

*Natale v. Country Ford Ltd.*, 287 F.R.D. 135, 137 (E.D.N.Y. 2012) (quoting *Roe v. City of New York*, 00-CV-9062 (RWS), 2003 WL 22715832, at *2 (S.D.N.Y. Nov. 19, 2003)).  New York law provides that an administrator or executor of a decedent's estate is a "representative" of the decedent, and therefore would be a proper party under Rule 25.  *See id.* at 137–38 (collecting cases).

In a letter to the Court on March 31, 2020, defense counsel represented that "Defendants [were] attempting to ascertain whether a representative ha[d] been appointed to [Raimo's] estate, and if so, how service should be made on the representative."  (Dkt. 19, at 1.)  In light of this representation, within thirty (30) days of this Memorandum & Order, defense counsel shall identify Raimo's representative or successor, and Plaintiffs shall update the SAC accordingly.[6]

---

[6] Although no party raises the issue, the Court notes that under Rule 25, if a motion for substitution "is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."  Fed. R. Civ. P. 25(a)(1).  Despite the mandatory language of Rule 25(a)(1), "[t]he Court is authorized to extend the time in which to file a motion for substitution before or after the expiration of the ninety-day period pursuant to Fed. R. Civ. P. 6(b)."  *Kernisant v. City of New York*, 225 F.R.D. 422, 427 (E.D.N.Y. 2005) (citation omitted); *see also Staggers v. Otto Gerdau Co.*, 359 F.2d 292, 296 (2d Cir. 1966) ("[T]he 90 day period was not intended to act as a bar to otherwise meritorious actions.").  Notably, in this case, Defendants do not object to substitution (Defs.' Reply, Dkt. 34-6, at 1), and the Court does not otherwise find that Defendants will be prejudiced by such substitution.  Nor is there any indication of bad faith on Plaintiffs' part.  Therefore, even if the 90-day period under Rule 25(a)(1) had expired by the time Plaintiffs moved to file the SAC, which the Court construes to include a motion for substitution, the Court finds that there is "excusable neglect" to justify extending the time for substitution in this case.  *See* Fed. R. Civ. P. 6(b)(1)(B); *see also LoSacco v. City of Middletown*, 71 F.3d 88, 93 (2d Cir. 1995) ("Excusable neglect under Rule 6(b) is a somewhat elastic concept and . . . may

### III.   Claims Against Defendant O'Neill

Defendants argue that the claims against Defendant O'Neill must be dismissed, and any amendment with respect to claims against O'Neill is futile, because O'Neill was not personally involved in the alleged incident on January 1, 2017. (*See* Defs.' Mot., Dkt. 34, at 10–11.) Although the SAC continues to name O'Neill as a defendant, Plaintiffs do not address this issue in their motion to amend. (*See generally* Pls.' Mot., Dkt. 36-1; SAC, Dkt. 36-2.) In fact, in responding to Defendants' request for a pre-motion conference, Plaintiffs conceded that "O'Neill should not be sued in his individual capacity and his exposure is limited to the City's *Monell* liability." (Dkt. 22, at 3.) Claims against O'Neill in his individual capacity are therefore dismissed. *Cf. De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 410 (S.D.N.Y. 2015) (collecting cases, and concluding that dismissal was "appropriate" because a party had "offered no factual or legal argument in opposition to [an opposing party]'s motion").

Additionally, any claim against O'Neill in his official capacity is duplicative of Plaintiffs' *Monell* claim against the City. *See Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) ("A claim asserted against an individual in his official capacity . . . is in effect a claim against the governmental entity itself, rather than a suit against the individual personally, for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell*, 436 U.S. at 691 n.55)); *see also Quinones v. City of Binghamton*, 997 F.3d 461, 466 n.2 (2d Cir. 2021) (noting that a plaintiff's official-capacity claims against individual defendants "merge into [the plaintiff's] claims against the City"); *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010) (summary order) (observing that a suit against

---

encompass delays caused by inadvertence, mistake, or carelessness[.]" (internal quotation marks, citations, and brackets omitted)).

9

municipal officials in their official capacities "is essentially a suit against the City" and "adds nothing to the suit" (brackets and citation omitted)). Accordingly, Defendants' motion to dismiss all claims against Defendant O'Neill is granted, and Plaintiffs may not amend their complaint with respect to claims against O'Neill, as amendment would be futile. *See Thea*, 807 F.3d at 496–97.

**IV.**   ***Monell* Claim Against the City**

A municipality like the City is liable under § 1983 "if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citations omitted); *see also Monell*, 436 U.S. at 690–94. Because liability cannot be based simply on a theory of *respondeat superior*, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agent." *Monell*, 436 U.S. at 691, 694. Rather, holding a municipality liable under § 1983 requires showing three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020); *see also Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality.").

A municipal policy or custom, however, "may be pronounced or tacit and reflected in either action or inaction." *Lucente*, 980 F.3d at 297 (quoting *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)). Thus, while municipal liability may be established by showing a violation of federal law pursuant to an express rule or policy, it may also be established where abuses are "sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware"; or where "a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials

to such abuses." *Jones*, 691 F.3d at 81 (citation omitted); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("Where a city's official policy is constitutional, but the city causes its employees to apply it unconstitutionally, such that the unconstitutional application might itself be considered municipal policy, the city may be held liable for its employees' unconstitutional acts."). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Yet, "[t]o satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the untrained employees come into contact.'" *Id.* (brackets omitted) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see also Amnesty Am.*, 361 F.3d at 129 ("[A] municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training.").

"'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of [their] action." *Connick*, 563 U.S. at 61 (brackets omitted) (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). The Second Circuit has outlined three requirements for establishing that a municipality's failure to train or supervise constitutes deliberate indifference: (1) "the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Jenkins v. City of New York*,

11

478 F.3d 76, 94 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)).

Here, Plaintiffs' allegations do not state a plausible claim of a failure to train by the City that amounts to deliberate indifference, even considering the "beefed up" allegations in the SAC (Pl.s' Mot., Dkt. 36-1, at 4) and viewing them in the light most favorable to Plaintiffs. The SAC alleges that: (1) "[t]he City through the NYPD is aware that an officer would encounter [] situation[s] where he/she has to apply the law as stated in the Constitution[,] particularly the 4th amendment rights to be free from unreasonable search and seizure"; (2) in these situations, the officer "faces a difficult choice to further engage in unconstitutional conduct or simply walk away from the situation"; (3) "[e]ither of these difficult choices lead[s] to the violation of constitutional rights and thus caus[es] injuries to individuals like [P]laintiff[s]"; and (4) the City "has failed to train its employees on the basic principles of the laws on 4th amendment search and seizure." (SAC, Dkt. 36-2, ¶¶ 31, 46.) These statements, however, are merely a recitation of the *Walker* deliberate-indifference standard couched as, yet devoid of any specific, factual allegations, and thus do not suffice. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *Rothstein*, 708 F.3d at 94; *cf. Acosta v. City of New York*, No. 11-CV-856 (KBF), 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing a failure-to-train *Monell* claim that merely recited the elements of the cause of action); *Brown v. City of New York*, No. 18-CV-3287 (JPO), 2021 WL 1225948, at *2 (S.D.N.Y. March 31, 2021) (dismissing a claim that simply "parrot[ed]" the legal standard without providing "specific facts or circumstances" (citation omitted)).

The SAC does aver that "[t]he NYPD's Patrol Guide, which spans thousands of pages detailing hundreds of police procedures, . . . does not contain a statement or guideline that the Fourth Amendment prohibits warrantless arrests or seizures without a [*sic*] probable cause . . . ."

12

(SAC, Dkt. 36-2, ¶ 34; *see also id.* ¶ 46i ("City does not have a policy and procedure on the law of entering a subject premises/private residence without a warrant.").) But this allegation, even accepted as true, does not permit any reasonable inference that there has been a failure to train amounting to deliberate indifference. The Court cannot infer that the NYPD does not train its officers on how to conduct proper searches and seizures, or that the City is deliberately indifferent, simply because the NYPD's Patrol Guide lacks a specific statement on warrantless seizures.

The SAC also refers to several cases involving Fourth Amendment claims against the NYPD—*Floyd v. City of New York*, 813 F. Supp. 2d 417 (S.D.N.Y. 2011); *Davis v. City of New York*, 959 F. Supp. 2d 324 (S.D.N.Y. 2013); and *McClary v. City of New York*, No. 12-CV-118 (CBA) (VVP) (E.D.N.Y. filed Jan. 10, 2012). (SAC, Dkt. 36-2, ¶¶ 33-2,[7] 35–39.) But even if prior lawsuits can be used to support a claim of deliberate indifference,[8] the prior lawsuits referenced in the SAC are inapposite, as those suits involved materially different facts and circumstances. The *Monell* claim in *McClary* centered around evidence of a lack of training regarding the proper execution of search warrants, whereas this case involves an alleged *warrantless* entry into a residence and non-consensual searches of the premises and its occupants. (*See* SAC, Dkt. 36-2, ¶¶ 36, 38–39.) *Floyd* and *Davis*—which involved the NYPD's race-based practice of stopping, questioning, and frisking pedestrians on the street and around New York City

---

[7] The SAC includes two paragraphs numbered "33." This citation references the second such paragraph.

[8] "Courts considering *Monell* claims have assigned different levels of significance to the filing of prior lawsuits." *Calderon v. City of New York*, 138 F. Supp. 3d 593, 611–12 (S.D.N.Y. 2015). While some courts "have suggested that non-adjudicated claims are irrelevant," *id.* at 612 (citing *Morris v. City of New York*, No. 12-CV-3959 (JG), 2013 WL 5781672, at *11 (E.D.N.Y. Oct. 28, 2013)), other courts "have held that prior complaints are relevant insofar as they may put a municipality on notice of possible or actual constitutional violations," *id.* (citing *Edwards v. City of New York*, No. 14-CV-10058 (KBF), 2015 WL 5052637, at *6 n.3 (S.D.N.Y. Aug. 27, 2015)).

Housing Authority buildings—are similarly inapposite to Defendants' allegedly unlawful attempt to enter Plaintiff Jacqueline Nixon's home and issuance of write-ups to ACS in retaliation for Plaintiffs denying entry.  *See Floyd*, 813 F. Supp. 2d at 422; *Davis*, 959 F. Supp. 3d at 355.  Moreover, as the SAC admits, *Floyd* and *Davis* ended in a settlement agreement in which the City agreed to adopt certain remedial measures, including changes to training and supervision surrounding the NYPD's stop-and-frisk practices—thus undercutting any inference that the unlawful practices and policies alleged in those cases were continuing at the time of the January 2017 incident alleged here, or that those prior lawsuits put the City on notice of the alleged police misconduct in this case.  (*See* SAC, Dkt. 36-2, ¶ 33-2); *see also Floyd v. City of New York*, 770 F.3d 1051, 1061–63 (2d Cir. 2014) (describing the remedial measures included in the settlement agreement and granting dismissal of the City's appeal).  In short, the cases referenced in the SAC do not evince a plausible claim that the City consciously disregarded a risk that constitutional violations of the type alleged here would occur without further training.[9]  *Cf. Connick*, 563 U.S. at 63 ("Because those [prior] incidents are not similar to the violation at issue here, they could not have put [the defendant] on notice that specific training was necessary to avoid this constitutional violation.").

Additionally, the SAC does not plausibly allege a causal link between any purported failure to train by the City and the alleged constitutional violations suffered by Plaintiffs.  *See generally Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) ("[A] plaintiff must

---

[9] The FAC references an additional case not referenced in the SAC—*Colon v. City of New York*, No. 09-CV-8 (JBW), 2009 WL 4263362, at *2 (E.D.N.Y. Nov. 25, 2009). (*Compare* FAC, Dkt. 12, ¶ 31, *with* SAC, Dkt. 36-2, ¶¶ 33-2–39.)  *Colon*, however, concerned allegations of "repeated, widespread falsification by arresting police officers of the [NYPD]."  2009 WL 4263362, at *2.  There are no such allegations of falsification here.  Therefore, *Colon* is similarly inapposite.

14

show that the municipal action was taken with the requisite degree of culpability *and* must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." (emphasis added)); *Askins*, 727 F.3d at 253 (explaining that establishing municipal liability requires showing not only that "the plaintiff suffered a tort in violation of federal law committed by the municipal actors" but also that the "commission of the tort resulted from a custom or policy of the municipality" (citations omitted)). As the Supreme Court has made clear, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on [a] city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390–91 (citations omitted). Indeed, "[a] training program is not inadequate merely because a few of its graduates deviate from what they were taught," *Jenkins*, 478 F.3d at 95, and thus, the law "unequivocally requires . . . that the factfinder's inferences of inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place," *Amnesty Am.*, 361 F.3d at 130 (citations omitted).

Yet, the allegations in the SAC essentially provide nothing more than conclusory statements that the alleged violations here were the result of a deliberate failure to train. (*See* SAC, Dkt. 36-2, ¶ 33-1[10] ("These deliberate indifference acts by the City through the NYPD and the existence of policy and custom and practice that leads to violation of constitutional rights of [P]laintiffs and is [*sic*] the proximate cause of injuries suffered by [P]laintiff[s] as outlined throughout this complaint."), ¶ 46v ("[D]ue to lack of proper training, the individual defendants and other police officers violated the law."), ¶ 46viii ("Had the City implemented an adequate training program then the individual defendants and other police officers would know how to act

---

[10] As noted, the SAC includes two paragraphs numbered "33." This citation references the first such paragraph.

when presented with a situation such as the one described herein. The training would include under what circumstances that police officers can enter a premises, the need for a warrant to search inside of a premises, [and] the probable cause needed to search individuals."), ¶ 53 ("The City's deliberate indifference was the moving force of the unconstitutional damage complained of herein.").) To the extent Plaintiffs rely on their allegation that the NYPD's Patrol Guide lacks a specific statement on warrantless seizures, even accepting it as true, that allegation does nothing to establish a causal link between a purported failure to train and the alleged constitutional violations in this case. Thus, the SAC's allegation about the NYPD's voluminous Patrol Guide by itself does not constitute sufficient factual matter that nudges Plaintiffs' claim "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570; *see also, e.g.*, *Ortiz v. Parkchester N. Condo.*, No. 16-CV-9646 (VSB), 2018 WL 2976011, at *9 (S.D.N.Y. June 13, 2018) (dismissing failure-to-train claim partly because the plaintiff "fail[ed] to allege any facts describing how [the defendant]'s purported failure to train specifically caused his constitutional deprivation"); *Tieman v. City of Newburgh*, No. 2015 WL 1379652, at *23 (S.D.N.Y. Mar. 26, 2015) (collecting cases, and concluding that the plaintiff failed to allege a plausible failure-to-train claim because the plaintiff did not plead "any facts suggesting that an alleged training deficiency *caused* his constitutional injury").[11]

---

[11] There is some question as to whether at the pleading stage a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." *See Amnesty Am.*, 361 F.3d at 129 (quoting *City of Canton*, 489 U.S. at 391). The Second Circuit has said, prior to *Twombly* and *Iqbal*, that "[i]t is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation." *Id.* at 130 n.10; *cf. Jenkins*, 478 F.3d at 94 ("[A]t the *summary judgment* stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." (emphasis added) (internal quotation marks and citation omitted)). Following *Twombly* and *Iqbal*, however,

16

Because the allegations in the SAC do not plausibly state a *Monell* claim against the City, that claim is dismissed. As Plaintiffs have already had an opportunity to amend their *Monell* claim, Plaintiffs may not file an amended complaint with respect to this claim. *See Thea*, 807 F.3d at 496–97 ("Proposed amendments are futile if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." (citation omitted)).

## CONCLUSION

Defendants' motion to dismiss is granted in its entirety, and Plaintiffs' motion to amend is granted in part and denied in part. The claims against the FAC Defendants, Police Commissioner O'Neill, and the City are dismissed, and they are terminated as parties to this action. Plaintiffs' SAC may not include claims against these defendants. Defense counsel shall identify Defendant

---

there has been some debate among courts in this circuit as to whether the pleading requirements of a failure-to-train claim have been altered, such that a plaintiff must allege a specific deficiency in the municipality's training program. Although now "courts generally require that a plaintiff provide more than a simple recitation of their theory of liability, even if that theory is based on a failure to train," *see, e.g.*, *Buari v. City of New York*, —F. Supp. 3d—, No. 18-CV-12299 (MKV), 2021 WL 1198371, at *23 (S.D.N.Y. Mar. 30, 2021) (internal quotation marks omitted) (collecting cases), some courts have disagreed, explaining that "the *Twombly/Iqbal* standard is 'context specific,' and a plaintiff has 'no realistic way to learn about a municipality's training programs without discovery,'" *Jackson v. Nassau County*, —F. Supp. 3d.—, No. 18-CV-3007 (JS) (AKT), 2021 WL 3207168, at *19 n.10 (E.D.N.Y. July 28, 2021) (quoting *Michael v. County of Nassau*, No. 09-CV-5200 (JS) (AKT), 2010 WL 3237143, at *4 (E.D.N.Y. Aug. 11, 2010)). The Second Circuit has not spoken decisively on this issue, but it has suggested that "[w]hile it may be true that § 1983 plaintiffs cannot be expected to know the details of a municipality's training programs prior to discovery, this does not relieve them of their obligation under *Iqbal* to plead a facially plausible claim." *Simms v. City of New York*, 480 F. App'x 627, 631 n.4 (2d Cir. 2012) (summary order) (internal citation omitted). "There are a number of ways that plaintiffs can plausibly allege a § 1983 claim for municipal liability premised on a failure to train theory without having detailed knowledge of a municipality's training programs," including "by alleging facts indicating '[a] pattern of similar constitutional violations by untrained [municipal] employees.'" *Id.* (alterations in original) (quoting *Connick*, 563 U.S. at 62). The Court concludes here that even if Plaintiffs need not specifically identify a deficiency in the City's training program that caused the alleged constitutional violations, Plaintiffs have failed to allege sufficient factual matter to state a facially plausible claim of municipal liability based on a failure to train, for all the reasons stated above.

Raimo's representative or successor within thirty (30) days of this Order, after which Plaintiffs shall update the SAC accordingly and may file it.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 3, 2021
      Brooklyn, New York